F O R   P U B L I C A T I O N

FILED

SEP 1 1 2006

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: ) | Case No. 06-22652-C-15 |
| ) | |
| TRI-CONTINENTAL EXCHANGE LTD., ) | |
| an International Business ) | |
| Company formed under laws of St.) | |
| Vincent and the Grenadines ) | |
| _____ ) | |
| COMBINED SERVICES LTD., an ) | Case No. 06-22655-C-15 |
| International Business Company ) | |
| formed under laws of St. Vincent) | |
| and the Grenadines ) | |
| _____ ) | |
| ALTERNATIVE MARKET EXCHANGE ) | Case No. 06-22657-C-15 |
| LTD., an International Business ) | |
| Company formed under laws of St.) | |
| Vincent and the Grenadines ) | |
| ) | |
| Debtors in a Foreign Proceeding.) | |
| _____ ) | |
| PETITION OF MALCOLM BUTTERFIELD,) | |
| BRIAN GLASGOW AND SIMON WHICKER ) | |
| AS FOREIGN REPRESENTATIVES OF ) | |
| THE ST. VINCENT AND THE ) | |
| GRENADINES FOREIGN PROCEEDING ) | |
| RESPECTING THE ST. VINCENT AND ) | |
| THE GRENADINES INTERNATIONAL ) | |
| BUSINESS COMPANIES KNOWN AS ) | |
| TRI-CONTINENTAL EXCHANGE LTD., ) | |
| COMBINED SERVICES LTD., and ) | |
| ALTERNATIVE MARKET EXCHANGE LTD.) | |
| _____ ) | |

MEMORANDUM DECISION REGARDING
RECOGNITION OF FOREIGN MAIN PROCEEDING

Forrest B. Lammiman, Lord Bissell & Brook LLP, Chicago, Illinois, and Joshua D. Wayser, Lord Bissell & Brook LLP, Los Angeles, California, for foreign representatives.

Thomas R. Phinney, Parkinson Phinney, Sacramento, California, for Bennett Truck Transport, LLC.

33

KLEIN, Bankruptcy Judge:

This memorandum decision supplements and revises this court's rulings that were made orally on the record at the time of hearing.

A creditor contends these joint liquidations under the laws of St. Vincent and the Grenadines ("SVG") should be recognized as foreign "nonmain," as opposed to "main," proceedings under 11 U.S.C. §§ 1502(4)-(5). The answer turns on the situs of the chapter 15 debtors' "center of main interests," which term is not defined and requires a fact-based inquiry in which the default position focuses on the registered office.

Here, the chapter 15 debtors conducted regular business operations at their registered offices in Kingstown, St. Vincent, in a manner that equates with a "principal place of business" under concepts of United States law. This suffices to qualify SVG as the "center of main interests" even though the enterprise perpetrated an insurance scam primarily in the United States and Canada. Hence, the three winding-up proceedings in SVG will be recognized in the United States as "foreign main proceedings."

The second issue presented is whether, in the name of "protecting" United States creditors, to impose restrictions beyond those prescribed in chapter 15 on the ability of the foreign representatives, and of the foreign court, to administer or realize the debtor's assets within the territorial jurisdiction of the United States. The answer is in the negative because all creditors in this instance will be better served by, as contemplated by 11 U.S.C. § 1521(a)(5), entrusting

administration and realization of assets to the foreign representatives without imposing a superfluous, and potentially inconsistent, tranche of judicial supervision.

## Facts

The debtors, Tri-Continental Exchange Ltd. ("TCE"), Combined Services Ltd. ("CSL"), and Alternative Exchange Ltd. ("AME"), are insurance companies organized as international business companies under the laws of the nation of St. Vincent and the Grenadines ("SVG") and are the subject of winding-up proceedings in the Eastern Caribbean Supreme Court, High Court of Justice, under the SVG Companies Act, No. 8 of 1994 and related statutes, that were filed by the International Financial Services Authority ("IFSA") of SVG as claim nos. 541-543 of 2004.  The Eastern Caribbean Supreme Court appointed Malcolm Butterfield, Brian Glasgow, and Simon Whicker as joint provisional liquidators on December 14, 2004, and as joint liquidators on June 14, 2005.

The debtors' only offices were located at Marcole Plaza, Halifax Street, Kingstown, St. Vincent, where there were approximately twenty employees.  There presently are no employees and no business being conducted.

Between 1995 and 2004, the debtors sold approximately 5,800 insurance policies in the United States and Canada, with estimated gross premiums of about $45,000,000.  The liquidators speculate (the books and records are not yet in their hands) that liabilities on the policies could be 130-140% of premiums.

The debtors, who lacked required insurance licenses and who falsely represented that their coverage was backed by licensed

- 3 -

and rated insurers, advertised greatly reduced rates to
industries that are difficult to insure, such as taxi drivers,
truckers, roofers, bars, restaurants, and clubs.

The debtors' lead underwriter, Lloyd Thomson, worked in the
debtors' registered offices in Kingstown, SVG.  He typically
received completed applications via facsimile transmission from
customers or "consultants."  He would prepare and fax a quote for
the insurance from the offices in SVG.  If the client accepted,
he would send confirmation of the security and policy number, and
other information, from those offices.

Checks for premium payments were mailed to drop boxes in the
United States, then forwarded in bundles to the debtors' office
in SVG, where they were endorsed for deposit and then sent back
to the United States and deposited into accounts maintained by
the debtors, from which wire transfers were made to accounts in
Jersey (Channel Islands), Ireland, Gibraltar, and elsewhere.

Although some small claims were paid, most claims went
unpaid, often on theories of large deductibles and restrictive
conditions barring coverage.

The impresario of this insurance scam was an individual who
assumed the identity "Robert Lewis Brown" (and obtained a United
States passport) in 1994 but who was really Matthew Wallace
Schachter, a United States citizen who relocated from New
Hampshire to Nevada in 1984 when New Hampshire authorities issued
a warrant for his arrest on check-kiting charges.  He worked in
the barter industry and eventually was indicted in Nevada for
federal tax evasion, which indictment was dismissed in 1996
because he had not been found.  As "Brown," he had relocated to

- 4 -

SVG by late 1994 and was establishing TCE, CSL, and AME.

The debtors' activities attracted the attention of various insurance regulators in the United States and Canada, resulting in cease and desist orders in at least nine jurisdictions against one or more of the debtors and "Brown."  In 2001, "Brown" was twice convicted in absentia in Canada for violating cease and desist orders.  In 2003, a Canadian arrest warrant was issued for "Brown's" arrest for insurance fraud relating to TCE.

In March 2004, as a result of pressure from SVG's IFSA to require the debtors to comply with SVG's International Insurance Act of 1998, the IFSA issued a statutory insurance manager's license to TCE to act as insurance manager for CSL and a Class II insurance license to CSL, which provided the IFSA with a $100,000 deposit for the benefit of policyholders.  Another condition of the licenses was that "Brown" relinquish control of the debtors, with which he complied only in form (and complied with an order to leave SVG for immigration violations, relocating to Barbados).

On August 9, 2004, a criminal complaint alleging mail fraud, money laundering, and related crimes was filed against "Brown" in the United States District Court for the Eastern District of California.  The record indicates that the federal investigation was assisted by the California Commissioner of Insurance.

"Brown" was arrested in Canada on September 3, 2004, six days before the debtors' offices in Kingstown were searched by SVG law enforcement agents, accompanied by United States counterparts, pursuant to a request under the Mutual Legal Assistance Treaty between the United States and SVG.  Most of the debtors' books and records were seized, inventoried as evidence,

and turned over to United States law enforcement authorities.

The United States seized a total of $1,603,653.95 from two bank accounts and a law firm during September 2004 and filed an in rem civil forfeiture action in 2005.  <u>United States v. Approx.</u> <u>$1,200,000.00 in U.S. Currency Seized from First Cal. Bank Acct.</u> <u>No. 2005638, et al.</u>, No. Civ. 05-149-DFL-KJM.

"Brown" died while in pretrial custody.  His spouse has since entered into a cooperation agreement with the United States Department of Justice ("USDOJ") undertaking to assist USDOJ and the joint liquidators in the recovery and transfer of "Brown's" estate to the joint liquidators, whose SVG winding-up proceeding has been, in effect, stayed in deference to the coordinated international criminal law enforcement effort.

The joint liquidators believe that they have identified up to $7,000,000 in assets that could be collected from various international locations and distributed to creditors.  In addition to $75,000 in SVG, they have identified cash assets of at least $3,500,000 at the Allied Irish Bank, which have been frozen by Irish authorities.  There is also real property in Ireland, Barbados, and (possibly) Spain.  In the United States, $1,603,653.95 is tied up in the asset forfeiture proceeding, a portion of which funds USDOJ is stipulating to release to the joint liquidators if this court recognizes a foreign proceeding.

At the hearing on recognition of the proceeding as a foreign proceeding, creditor Bennett Truck Transport LLC ("Bennett Truck"), which has a judgment against the debtors, contended that the "center of main interests" should be regarded as the United States because most of the creditors are insureds located in the

- 6 -

United States.   In addition, claiming lien status, Bennett Truck
opposed permitting any funds from a United States source to be
used to pay such items as professional fees and expenses without
approval from this court pursuant to the Bankruptcy Code.

## Jurisdiction

Federal subject-matter jurisdiction over a case under
chapter 15 of title 11 is founded upon 28 U.S.C. § 1334(a).   The
recognition of foreign proceedings and other matters under
chapter 15 of title 11 are core proceedings that a bankruptcy
judge may hear and determine, entering appropriate orders and
judgments.   28 U.S.C. § 157(b)(2)(P).

## Discussion

Since this is the sole instance in which the Bankruptcy Code
can be used to liquidate an insurance company, a brief review of
basics is warranted before turning to the issues of "center of
main interests" and of whether to impose restrictions on the
foreign representatives.

I

Chapter 15 of the Bankruptcy Code was enacted in 2005 as an
implementation of the Model Law on Cross-Border Insolvency
promulgated by the United Nations Commission on International
Trade Law ("UNCITRAL" and "Model Law") in 1997 based on a process
in which the United States was an active participant.   H.R. Rep.
No. 109-31, at 105-07 (2005); Jay Lawrence Westbrook, <u>Chapter 15
at Last</u>, 79 AM. BANKR. L.J. 713, 719-20 (2005) ("Westbrook"); <u>see</u>

1  <u>generally</u> Samuel L. Bufford et al., Int'l Insolvency (Fed. Judicial

2  Ctr. 2001) at 55-68 ("FJC Int'l Insolvency").

3      The language of chapter 15 tracks the Model Law, with

4  adaptations designed to mesh with United States law.  H.R. Rep.

5  No. 109-31, at 105-07; Westbrook, 79 Am. Bankr. L.J. at 719.

6  Congress prescribed a rule of interpretation that expressly

7  requires United States courts to take into account the statute's

8  international origin and to promote applications of chapter 15

9  that are consistent with versions of the Model Law adopted in

10 other jurisdictions.  11 U.S.C. § 1508; H.R. Rep. No. 109-31, at

11 109-10.[1]

13                            II

14     The SVG winding-up proceeding is a "foreign proceeding," as

15 defined by 11 U.S.C. § 101(23), because it is a collective

16 judicial or administrative proceeding in a foreign country under

18     [1]The House Report elaborates:

19

20     Interpretation of this chapter on a uniform basis will be
       aided by reference to the Guide [to Enactment of the
21     UNCITRAL Model Law on on Cross-Border Insolvency, U.N. Doc.
       A/CN.9/442 (1997)] and the Reports cited therein, which
22     explain the reasons for the terms used and often cite their
       origins as well.  Uniform interpretation will also be aided
23     by reference to CLOUT, the UNCITRAL Case Law On Uniform
       Texts, which is a service of UNCITRAL.  CLOUT receives
24     reports from national reporters all over the world
       concerning court decisions interpreting treaties, model
25     laws, and other text promulgated by UNCITRAL.  Not only are
       these sources persuasive, but they advance the crucial goal
26     of uniformity of interpretation.  To the extent that the
       United States courts rely on these sources, their decisions
27     will more likely be regarded as persuasive elsewhere.

28 H.R. Rep. No. 109-31, at 109-10.

                         - 8 -

a law relating to insolvency in which the assets and affairs of the debtors are subject to control or supervision by a foreign court for the purpose of liquidation. SVG's Companies Act is modeled on the English Companies Act of 1948 and provides for insolvency proceedings in which the assets and affairs of debtors control by the Eastern Caribbean Supreme Court.

Similarly, the joint liquidators have been authorized by the Eastern Caribbean Supreme Court to administer the liquidation of the debtors' assets and affairs in the SVG proceeding and, thus, are "foreign representatives," within the meaning of 11 U.S.C. § 101(24).

The status of a debtor in this case as a foreign insurance company that is ineligible to be a debtor under the Bankruptcy Code by virtue of 11 U.S.C. § 109(b)(3) does not affect the availability of chapter 15 relief. Foreign insurance companies are eligible for chapter 15 relief because § 1501(c)(1) provides that chapter 15 does not apply to "a proceeding concerning an entity, other than a foreign insurance company, identified by exclusion in section 109(b)." 11 U.S.C. § 1501(c)(1).

The possibility that an entity that is ineligible to be a debtor under the Bankruptcy Code could be the subject of a chapter 15 proceeding necessitated a special definition of "debtor": "For the purposes of this chapter [15], ... 'debtor' means an entity that is the subject of a foreign proceeding." 11 U.S.C. § 1502(1).

III

As to the objection by creditor Bennett Truck that the case should only be recognized as a "foreign nonmain proceeding," the battle is over whether the foreign representatives will have the benefits of the effects of recognition of a "foreign main proceeding," as detailed at 11 U.S.C. § 1520, including the triggering of the automatic stay and the authorization to operate the debtors' business and exercise trustee rights and powers under 11 U.S.C. §§ 363 and 552.

A "foreign main proceeding" is a foreign proceeding that is pending in the country in which the debtor has its "center of main interests."  11 U.S.C. § 1502(4).

The term "center of main interests" is taken from the UNCITRAL Model Law and is not further defined.  It is a term that has not heretofore been used in United States jurisprudence but is described as a "critically important new concept."  FJC INT'L INSOLVENCY at 58.

Professor Westbrook has explained that the adoption of the term in chapter 15 was intentionally designed to promote international uniformity:

> Chapter 15 was drafted to follow the Model Law as closely as possible, with the idea of encouraging other countries to do the same.  One example is use of the phrase "center of main interests," which could have been replaced by "principal place of business" as a phrase more familiar to American judges and lawyers.  The drafters of Chapter 15 believed, however, that such a crucial jurisdictional test should be uniform around the world and hoped that its adoption by the United States would encourage other countries to use it as well.

Westbrook, 79 AM. BANKR. L.J. at 719-20.

Although not defined, several other chapter 15 provisions

- 10 -

inform the analysis of what constitutes a "center of main interests," as does an examination of the source from which the drafters of the Model Law borrowed the concept.

First, the rule of interpretation prescribed ("the court shall consider") by § 1508 requires that the term "center of main interests" be interpreted in a manner consistent with the application of similar statutes adopted by foreign jurisdictions. 11 U.S.C. § 1508.[2]  In furtherance of what it described in the previously-quoted passage as "the crucial goal of uniformity of interpretation," Congress also focused the attention of United States courts to various international sources when construing chapter 15, which sources Congress described as "persuasive." House Rep. No. 109-31 at 109-10.

One of the sources that a United States court is obliged to treat as persuasive is the Guide to Enactment of the UNCITRAL Model Law Insolvency that was promulgated in connection with the approval of the Model Law.  GUIDE TO ENACTMENT OF THE UNCITRAL MODEL LAW ON CROSS-BORDER INSOLVENCY, U.N. Gen. Ass., UNCITRAL 30th Sess., U.N. Doc. A/CN.9/442 (1997) ("Guide")

The Guide explains that the use of the concept "where the debtor has the centre of its main interests" as the determinant that a foreign proceeding is a "main" proceeding was modeled on

---

[2]The statute provides:

In interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions.

11 U.S.C. § 1508.

the use of that concept in the European Union Convention on

Insolvency Proceedings ("EU Convention") that was already in the

process of being adopted when UNCITRAL drafted the Model Law.[3]

In the European Union, the broadest grant of jurisdiction is

to the courts of the Member State where "the centre of a debtor's

main interests is situated."[4]  In the regulation adopting the EU

Convention, the concept is elaborated upon as "the place where

the debtor conducts the administration of his interests on a

regular basis and is therefore ascertainable by third parties."

Council Reg. (EC) No. 1346/2000, ¶ 13.[5]  This generally equates

---

[3]The Guide addresses this point twice:

> 31. A foreign proceeding is deemed to be the "main" proceeding if it has been commenced in the State where "the debtor has the centre of its main interests".  This corresponds to the formulation in article 3 of the European Union Convention on Insolvency Proceedings, thus building on the emerging harmonization as regards the notion of a "main" proceeding.

GUIDE at ¶ 31.

> 72. The expression "centre of ... main interests", used in subparagraph (b) to define a foreign main proceeding, is used also in the [EU] Convention on Insolvency Proceedings.

Id., at ¶ 72 (ellipsis in original).

[4]The first sentence of the first paragraph of Article 3 is:

> The courts of the Member State within the territory of which the centre of a debtor's main interests is situated shall have jurisdiction to open insolvency proceedings.

EU Convention on Insolvency, art. 3, ¶ 1, O.J. L 160/1 (June 30, 2000).

[5]The preambular portion of the regulation explains:

> (13) The "centre of main interests" should correspond to the place where the debtor conducts the administration of his

- 12 -

with the concept of a "principal place of business" in United States law.

The statutory presumption created by § 1516(3), on close examination, confirms that an entity's "principal place of business" in United States jurisprudence is that entity's "center of main interests" for purposes of § 1502(4):

> In the absence of <u>evidence</u> to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests.

11 U.S.C. § 1516(3) (emphasis supplied).

In contrast to "<u>evidence</u> to the contrary," both the Model Law and the EU convention use the phrase "in the absence of <u>proof</u> to the contrary."[6]  The Guide, however, explains that the concept is one of a default rule to be applied in the absence of evidence that the debtor's main interests are centered in some place

---

> interests on a regular basis and is therefore ascertainable by third parties.

Council Reg. (EC) No. 1346/2000 of 29 May 2000 on insolvency proceedings, ¶ 13.

> [6]The Model Law provides:

> In the absence of <u>proof</u> to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the centre of the debtor's main interests.

Model Law, art. 16(3) (emphasis supplied).

The EU Convention provides, in the second sentence of the first paragraph of article 3:

> In the case of a company or legal person, the place of the registered office shall be presumed to be the centre of its main interests in the absence of <u>proof</u> to the contrary.

EU Convention, art. 3 (emphasis supplied).

- 13 -

different from the registered office.  GUIDE ¶ 122.[7]  Similarly,
under the EU Convention, the key question is the situs of the
conduct of the administration of the debtor's business on a
regular basis that is known to third parties.  Council Reg. (EC)
No. 1346/2000, ¶ 13.

Congress chose to substitute "evidence" for "proof" and
otherwise to adopt the Model Law provision word-for-word.  The
explanation was that the substitution conformed to United States
terminology and made clear that the burden of proof of "center of
main interests" is on the foreign representative who is applying
for recognition of a foreign proceeding as a main proceeding.[8]

---

[7]The Guide explains:

Article 16 establishes presumptions that allow the court to
expedite the evidentiary process; at the same time they do
not prevent, in accordance with the applicable procedural
law, calling for or assessing other evidence if the
conclusion suggested by the presumption is called into
question by the court or an interested party.

GUIDE ¶ 122.

[8]The  explained:

Although sections 1515 and 1516 are designed to make
recognition as simple and expedient as possible, the court
may hear proof on any element stated.  The ultimate burden
as to each element is on the foreign representative,
although the court is entitled to shift the burden to the
extent indicated in section 1516.  The word "proof" in
subsection (3) has been changed to "evidence" to make it
clearer using United States terminology that the ultimate
burden is on the foreign representative.  "Registered
office" is the term used in the Model Law to refer to the
place of incorporation or the equivalent for an entity that
is not a natural person.  The presumption that the place of
the registered office is also the center of the debtor's
main interest is included for speed and convenience of proof
where there is no serious controversy.

- 14 -

This comports with the concept of a rebuttable presumption for purposes of Federal Rule of Evidence 301.  FED. R. EVID. 301.[9]

In effect, the registered office (or place of incorporation) is evidence that is probative of, and that may in the absence of other evidence be accepted as a proxy for, "center of main interests."  The registered office, however, does not otherwise have special evidentiary value and does not shift the risk of nonpersuasion, i.e. the burden of proof, away from the foreign representative seeking recognition as a main proceeding.

Thus, if the foreign proceeding is not in the country of the registered office, then the foreign representative has the burden of proof on the question of "center of main interests." Correlatively, if the foreign proceeding is in the country of the registered office, and if there is evidence that the center of main interests might be elsewhere, then the foreign representative must prove that the center of main interests is in the same country as the registered office.

It follows that the burden of proof as to the "center of main interests" is never on the party opposing "main" status and

---

H.R. Rep. No. 109-31, at 112-13.

[9]That rule provides:

> Presumptions in General in Civil Actions and Proceedings.
> In all civil actions and proceedings not otherwise provided
> for by Act of Congress or by these rules, a presumption
> imposes on the party against whom it is directed the burden
> of going forward with evidence to rebut or meet the
> presumption, but does not shift to such party the burden of
> proof in the sense of the risk of nonpersuasion, which
> remains throughout the trial upon the party on whom it was
> originally cast.

FED. R. EVID. 301.

that such an opponent has only a burden of going forward to
adduce some evidence inconsistent with the registered office
warranting a conclusion of "main" status.    FED. R. EVID. 301.

IV

Finally, Bennett Truck, which claims to have a lien on all
of the funds tied up in the in rem proceeding, urges that this
court exercise its discretion under 11 U.S.C. § 1522(b) to impose
additional conditions on the release of the portion of the seized
$1,603,653.95 that USDOJ is prepared to dismiss from the in rem
proceeding and turn over to the foreign representatives once the
foreign proceeding is recognized.    Bennett Truck is particularly
concerned that the funds entrusted to the foreign representatives
might be used to pay expenses of administration.

There are two distinct forms of entrustment in § 1521.    The
foreign representatives ask that, under § 1521(a)(5), they be
entrusted with "the administration or realization of" the
debtors' assets within the territorial jurisdiction of the United
States.    11 U.S.C. § 1521(a)(5).    They do not ask that, under
§ 1521(b), they be entrusted with "the distribution of all or
part of the debtor's assets located in the United States."    11
U.S.C. § 1521(b).

Although this court indicated at the time of the hearing
that it was prepared to require that its specific permission be
obtained for any use of the funds, more mature reflection upon
the structure of chapter 15 and of the record reveals that the
statutory structure is adequate to the task without the confusion
of imposition of other provisions.    Indeed, the additional level

- 16 -

of judicial scrutiny could place this court in the position of having to review the rulings of the foreign court in a manner that might be dysfunctional and operate to diminish the overall value of recovery for all creditors.

A

To be sure, chapter 15 provides ample authority for this court to impose restrictions so as to protect United States creditors to a greater extent than otherwise provided in chapter 15 and in other applicable provisions of the Bankruptcy Code.

As noted, for the moment, all that is requested is a § 1521(a)(5) entrustment of administration and realization of assets without any entrustment of distribution.

If and when it comes to distribution, § 1521(b) authorizes the court, in its discretion, to entrust the distribution of assets located in the United States to the foreign representatives on the condition that the court be satisfied that the interests of creditors in the United States are "sufficiently protected."   11 U.S.C. § 1521(b).[10]  This provision is based on Model Law article 21, with the substitution of "sufficiently

---

[10]The text of the provision is:

(b) Upon recognition of a foreign proceeding, whether main or nonmain, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, including an examiner, authorized by the court, provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected.

11 U.S.C. § 1521(b) (emphasis supplied).

- 17 -

protected" in lieu of the Model Law's "adequately protected" in order to avoid confusion with the Bankruptcy Code's defined term of art "adequate protection."  H.R. Rep. No. 109-31, at 115.[11]

In addition, § 1522 authorizes the court to assure that interests of creditors and interested parties are "sufficiently protected," to impose conditions on any discretionary relief, including both forms of entrustment under § 1521, and to modify or terminate discretionary relief.[12]  Congress explained that the

---

[11]The House Report explains:

This section follows article 21 of the Model Law, with detailed changes to conform to United States law. ...  The word "adequately" in the Model Law, articles 21(2) and 22(1), has been changed to "sufficiently" in sections 1521(b) and 1522(a) to avoid confusion with a very specialized legal term in United States bankruptcy, "adequate protection."

H.R. Rep. No. 109-31, at 115.

[12]The text of the statute is:

(a) The court may grant relief under section 1519 or 1521, or may modify or terminate relief under subsection (c), only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected.

(b) The court may subject relief granted under section 1519 or 1521, or the operation of the debtor's business under section 1520(a)(3), to conditions it considers appropriate, including the giving of security or the filing of a bond.

(c) The court may, at the request of the foreign representative or an entity affected by relief granted under section 1519 or 1521, or at its own motion, modify or terminate such relief.

(d) Section 1104(d) shall apply to the appointment of an examiner under this chapter.  Any examiner shall comply with the qualification requirements imposed on a trustee by section 322.

11 U.S.C. § 1522.

section was based on Model Law article 22 and that the bankruptcy court was being given "broad latitude to mold relief to meet specific circumstances."   H.R. Rep. No. 109-31, at 116.[13]

---

[13]1.   The House Report explains:

> This section follows article 22 of the Model Law with changes for United States usage and references to relevant Bankruptcy Code sections.   [Footnote citing GUIDE at 47.]   It gives the bankruptcy court broad latitude to mold relief to meet specific circumstances, including appropriate responses if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors.   For a response to a showing that the conditions necessary to recognition did not actually exist or have ceased to exist, see section 1517.   Concerning the change of "adequately" in the Model Law to "sufficiently" in this section, see section 1521.   Subsection (d) is new and simply makes clear that Bankruptcy Code section 1104(d) shall apply to the appointment of an examiner appointed in a case under chapter 15 and such examiner shall be subject to certain duties and bonding requirements based on those imposed on trustees and examiners under other chapters of this title.

H.R. Rep. No. 109-31, at 116.

> The Model Law version of article 22 is:

> 1.   In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article, the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

> 2.   The court may subject relief granted under article 19 or 21 to conditions it considers appropriate.

> 3.   The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or at its own motion, modify or terminate such relief.

Model Law, art. 22.

Section 1522(a) conditions any discretionary relief under § 1521 or § 1519 (pre-recognition relief) upon the interests of creditors and other interested entities, including the debtor, being "sufficiently protected." 11 U.S.C. § 1522(a).

Section 1522(b) permits the court to impose conditions on any discretionary relief that it grants, which permits it to achieve an appropriate balance. 11 U.S.C. § 1522(b).

If it later appears that conditions should be either imposed or relaxed, § 1522(c) authorizes a court, on its own motion or upon request, to modify or terminate any discretionary relief it has granted. 11 U.S.C. § 1522(c).

Standards that inform the analysis of § 1522 protective measures in connection with discretionary relief emphasize the need to tailor relief and conditions so as to balance the relief granted to the foreign representative and the interests of those affected by such relief, without unduly favoring one group of creditors over another. GUIDE at ¶¶ 161-63.[14]

---

[14]The Guide elaborates:

161.  The idea underlying article 22 is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief.  This balance is essential to achieve the objectives of cross-border insolvency legislation.

162.  The reference to the interests of creditors, the debtor and other interested parties in article 22, paragraph 1, provides useful elements to guide the court in exercising its powers under article 19 or 21.  In order to allow the court to tailor the relief better, the court is clearly authorized to subject the relief to conditions (paragraph 2) and to modify or terminate the relief granted (paragraph 3).  An additional feature of paragraph 3 is that it expressly gives standing to the parties who may be affected by the

Additional protection is embodied in the § 1506 public policy exception, which permits the court to refuse to take an action governed by chapter 15 if the action would be manifestly contrary to the public policy of the United States.   11 U.S.C. § 1506.[15]   Congress has indicated, with its use of the phrase "manifestly contrary," that this exception is to be narrowly construed, which view is consistent with the explication in the Guide.   H.R. Rep. No. 109-31, at 109; GUIDE, ¶¶ 88-89.[16]

---

consequences of articles 19 and 21 to petition the court to modify and terminate those consequences.  Apart from that, article 22 is intended to operate in the context of the procedural system of the enacting State.

163.  In many cases the affected creditors will be "local" creditors.  Nevertheless, in enacting article 22, it is not advisable to attempt to limit it to local creditors.  Any express reference to local creditors in paragraph 1 would require a definition of those creditors.  An attempt to draft such a definition (and to establish criteria according to which a particular category of creditors might receive special treatment) would not only show the difficulty of crafting such a definition but would also reveal that there is no justification for discriminating creditors on the basis of criteria such as place of business or nationality.

GUIDE, ¶¶ 161-63 (emphasis supplied).

[15]The text of the statute is:

Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States.

11 U.S.C. § 1506.

[16]The House Report explains:

This provision follows the Model Law article 5 exactly, is standard in UNCITRAL texts, and has been narrowly interpreted on a consistent basis in courts around the world.  The word "manifestly" in international usage restricts the public policy exception to the most

- 21 -

1  Nevertheless, the public policy exception could be invoked as a

2  rationale for imposing specific protections.

3      In short, the court has ample tools for dealing with the

4  manner in which a chapter 15 case is administered.

5

6                                  B

7      The question becomes whether to impose additional

8  restrictions in this instance at the request of a creditor who

9  claims that it has a lien on all of the seized funds in the im

10 rem proceeding.

11     There is no controversy that the funds to be released by

12

13 _____

       fundamental policies of the United States.
14
   H.R. Rep. No. 109-31, at 109 (citing GUIDE in omitted footnote).
15
       The Guide elaborates:
16
       88.  For the applicability of the public policy exception in
17     the context of the Model Law it is important to note that a
       growing number of jurisdictions recognize a dichotomy
18     between the notion of public policy as it applies to
       domestic affairs, as well as the notion of public policy as
19     it is used in matters of international cooperation and the
       question of recognition of effects of foreign laws.  It is
20     especially in the latter situation that public policy is
       understood more restrictively than domestic public policy.
21     This dichotomy reflects the realization that international
       cooperation would be unduly hampered if public policy would
22     be understood in an extensive manner.

23
       89.  The purpose of the expression "manifestly", used also
24     in many other international legal texts as a qualifier of
       the expression "public policy", is to emphasize that public
25     policy exceptions should be interpreted restrictively and
       that article 6 is only intended to be invoked under
26     exceptional circumstances concerning matters of fundamental
       importance for the enacting State.
27

28 GUIDE, ¶¶ 88-89.

                              - 22 -

agreement of USDOJ from the in rem proceeding would be maintained in a deposit account within the jurisdiction of this court.  The foreign representatives do not ask to be entrusted with distribution of assets under § 1521(b), rather they merely ask to be entrusted to administer and realize assets under § 1521(a)(5).

Neither USDOJ, nor the California Commissioner of Insurance, nor any party in interest other than Bennett Truck has expressed any difficulty with the sufficiency of the protections inherent in requiring that funds delivered to the foreign representatives as a form of realization of assets under § 1521(a)(5) be maintained within the jurisdiction of the court.

It is not necessary to place an additional restriction on disbursements when the foreign representatives are not being entrusted to distribute assets that are being maintained within the jurisdiction of the court.

An automatic consequence of recognition of a foreign main proceeding is that § 363 applies.  11 U.S.C. § 1520(a)(2).  As a consequence, cash collateral cannot be used without permission. 11 U.S.C. § 363(c)(2).

The gravamen of Bennett Truck's position is that it contends that it has a lien on all the funds to be released by USDOJ from the in rem proceeding such that it is entitled to all of the seized funds.  Whether Bennett Truck actually has an enforceable lien has been neither conceded nor definitively determined.  If it does have an enforceable lien, then the funds are cash collateral that are subject to the protection of § 363(c)(2) that is already in effect by virtue of recognition of the foreign main proceeding.  If Bennett Truck, however, does not have an

- 23 -

enforceable lien, then it should not enjoy the quasi-lien status that would result from a specific restriction on the entrustment of administration and realization of assets to the foreign representatives.

Nor is the proposed restriction entirely innocuous. Although the foreign representatives are confident that they can realize up to $7,000,000 in assets from foreign sources, most of which would eventually be distributed to United States creditors, the use of some of the released funds may be required in order to achieve that result. Depriving the foreign representatives of resources needed to recover the $7,000,000 could frustrate the goal of chapter 15 to maximize the value of the cross-border estate that is available for distribution to creditors.

The fact that most of the creditors are United States entities means that shortfalls in recoveries necessarily will operate to their detriment regardless of whether one takes a "universalist" or a "territorialist" approach to cross-border insolvencies. See Westbrook, 79 Am. Bankr. L.J. at 715-16.

The court is mindful that reliance on the protections of § 363(c)(2) restricting the use of cash collateral exposes the estate to the credit risk of the foreign representatives in the event they act contrary to the Bankruptcy Code. In the circumstances of this case, where there has been substantial cross-border law enforcement cooperation and where the law governing the foreign proceeding is structured to protect an estate from depredation by professionals, this court predicts that the foreign representatives will be punctilious in their performance of duty and, hence, is satisfied that the credit risk

- 24 -

is an acceptable risk.

The procedural history of the winding-up proceedings indicate that the matter is well in hand.  Chapter 15 provides sufficient procedures for cooperation and communication between this court and the Eastern Caribbean Supreme Court.  11 U.S.C. §§ 1525-27; INTERIM FED. R. BANKR. P. 5012; see generally, GUIDELINES APPLICABLE TO COURT-TO-COURT COMMUNICATIONS IN CROSS-BORDER CASES (Am. L. Inst. & Int'l Insolvency Inst.) (adopted 2000 & 2001); FJC INT'L INSOLVENCY at 93-94.  The record does not warrant this court placing itself in a position in which it could impede the progress of the main SVG proceeding, which is the vehicle through which it is anticipated that the primary recovery for all creditors, including creditors in the United States, will be accomplished.

If it later transpires that there is reason for this court to have discomfort about its conclusion, § 1522(c) enables it to revise its position and exercise its § 1522(b) authority to impose conditions on the § 1521(b)(5) entrustment to the foreign representatives, such as the giving of security or the filing of a bond.


***

The proceedings will be recognized as "foreign main proceedings" under § 1502(4).  The discretionary relief requested by the foreign representatives will be granted without the previously-announced condition of requiring specific permission,

- 25 -

beyond that required by applicable bankruptcy law, for use of funds.  An appropriate order shall issue.

Dated:   September 11, 2006.

_____
UNITED STATES BANKRUPTCY JUDGE

1

### CERTIFICATE OF SERVICE

2    On the date indicated below, I served a true and correct
copy(ies) of the attached document by placing said copy(ies) in a
3    postage paid envelope addressed to the person(s) hereinafter
listed and by depositing said envelope in the United States mail
4    or by placing said copy(ies) into an interoffice delivery
receptacle located in the Clerk's Office.

5

6    Jonathan F. Bank
Joshua D. Wayser
7    Lord Bissell & Brook LLP
300 S. Grand Ave., Suite 800
8    Los Angeles, CA 90071

9    Forrest B. Lammiman
Aaron C. Smith
10    Lord Bissell & Brook LLP
111 S Wacker Dr
11    Chicago, IL 60606-4410

12    Parkinson Phinney
400 Capitol Mall, #2540
13    Sacramento, CA 95814

14    Sherman & Sherman
2115 Main Street
15    Santa Monica, Ca 90405

16    Law Office of Eric Honig
P.O. Box 10327
17    Marina del Rey, CA 90295

18    Gregory J. Hughes, Esq.
3017 Douglas Blvd #300
19    Roseville, CA 95661

20

21    Dated: 9-13-06

22

23    _____
DEPUTY CLERK

24

25

26

27

28

- 27 -